# United States Court of Appeals
## For the First Circuit

No. 07-1520

UNITED STATES,

Appellee,

v.

GUILLERMO FREDERICO VASCO,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. George A. O'Toole, Jr., U.S. District Judge]

Before

Lynch, Chief Judge,
Lipez and Howard, Circuit Judges.

Melvin Norris with whom Richard J. Farrell, Jr. was on brief,
for appellant.
Sandra S. Bower, Assistant United States Attorney, with whom
Michael J. Sullivan, United States Attorney, and Mark T. Quinlivan,
Assistant United States Attorney, were on brief, for appellee.

April 17, 2009

**HOWARD**, **Circuit Judge**. Guillermo Vasco was convicted of five counts of using interstate commerce facilities in the commission of murder-for-hire of his wife and daughter. See 18 U.S.C. § 1958. He appeals his convictions, arguing both that the district court erred in failing to give an entrapment instruction and that there was insufficient evidence to conclude that he intended to hire someone to murder his daughter. He also appeals his sentence, alleging errors in the application of the Sentencing Guidelines and sentencing factor manipulation. We affirm.

## I.

### A.  Background Facts

This case involves a kidnap and murder plot hatched by Guillermo Vasco in late 2004 or early 2005, while he was incarcerated at the Essex County, Massachusetts Correctional Facility ("ECCF"). Vasco devised the plan with the assistance of fellow inmate Kevin Perry, who unbeknownst to Vasco was a government informant. For purposes of the sufficiency of evidence challenge, we present the facts in the light most favorable to the verdict. United States v. Marin, 523 F.3d 24, 27 (1st Cir. 2008).

Vasco had been arrested on state charges in May 2004 and was in custody awaiting trial for allegedly assaulting and raping his estranged wife Tricia Vasco in the presence of their infant daughter Claudia. Over the course of several months, a friendship developed between Vasco and Kevin Perry, another ECCF inmate.

-2-

Eventually, Vasco asked Perry for assistance in finding someone to kill Tricia. Vasco explained the criminal charges against him, and that Tricia was set to testify against him on June 18, 2005. Vasco also told Perry that he wanted his daughter kidnaped and taken to a different country, but if that was impossible, he wanted her killed as well. Perry, incarcerated on drug distribution charges and facing a twenty-year statutory minimum sentence, had been cooperating with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") in other investigations in hopes of reducing his sentence. He contacted the ATF in March 2005 with information about Vasco, which led to an ATF undercover investigation.

Pursuant to the investigative plan, Perry was to give Vasco specific instructions for contacting Perry's friend "Mike," a hit man who was in reality ATF Special Agent Kenneth Croke. Vasco would write a letter to Mike, communicating the details of his request. Mike's address was a post office box in Portland, Maine.

Perry shared the instructions for contacting Mike with Vasco. Perry also made handwritten notes, based on his conversations with Vasco, containing detailed information about Tricia, including maps of the house where she lived. In these handwritten notes, under the heading "Questions," appears a reference to Claudia: "Can Claudia be saved, brought to Germany or other? (important) * (thru Canada)." The notes also disclosed that

-3-

Vasco had established a code to use in discussing the murder. Tricia would be referred to as a dog named "Nickie," Claudia as Nickie's puppy "Candy," and the method of disappearance as "bring[ing] to vet." Perry mailed these notes to the ATF.

Several days later, Vasco wrote to Mike at the Portland post office box. In the letter, Vasco wrote:

> I've heard that our friends and their doggy Nickie will take a trip down there, Ah? That would be great if you could help them. But Nickie is very old and sick. She won't survive such trip . . . the only thing would be to put Nickie to sleep . . . I know . . . Sad but true . . . . She was soo loyal and obidient. Anyways if so can she be buried outside of Mass . . . ? Making sure that Nickie will be 10 feet down and do not forget the cement thing. Also I'd like to know if Candy would be able to see the family if not she must stay with Nickie down there. . . . I wish there is a better choice. Will be much more Nickie's . . . I promes ya . . . ok? In the other hand I'll send a the money collection that I mentioned. Remember that it's value more than five thousand dollars . . . .

(Errors in original.) The letter was in Vasco's handwriting but bore as a return address Perry's name and inmate number at ECCF.

Agent Croke retrieved this letter and, posing as Mike, arranged to meet with Vasco at the ECCF on April 26. During their meeting, which was secretly recorded by Croke, Vasco read aloud from the "Nickie" letter, and when Croke asked who "Nickie" was, Vasco responded, "My wife." Vasco showed to Croke photos of Tricia, as well as pictures of Claudia, saying, "This is the

-4-

puppy." Vasco described his wishes for Claudia: that the "puppy" should go to Canada and from there to Vasco's mother in Ecuador. They discussed details of how to execute the kidnaping. They also discussed disposing of Tricia's body in a cement-filled oil drum to be dropped in the ocean. Vasco made a reference to avoiding what happened to Scott Peterson, who, in a highly publicized case in California, had been convicted of murdering his wife after her body, which he had disposed of in San Francisco Bay, floated to the surface.

Vasco agreed to pay for Mike's services from Vasco's "international money collection," valued by Vasco at between $5,000 and $10,000, and also through periodic installments once he had been released from jail and was back in Ecuador. A friend of Mike's (in reality another undercover ATF agent) would pick up the money collection from Vasco's attorney. Perry had initially offered to help Vasco pay for the hit man, but he did not repeat the offer and Vasco did not take him up on it.

Over the next few weeks, Vasco and Croke had three telephone conversations, also secretly recorded. On April 28, Vasco and Croke discussed whether Vasco had developed "cold feet." Perry had called Croke to tell him that Vasco had some concerns, and when Vasco came on the line Croke told him that if he did not want to go forward, that was "fine by me . . . I haven't put any time or money into it . . . . [I]f, you know, you don't want to do

it, it's, it's fine . . . ." Vasco responded that he did in fact want to go forward with the plan. "[Y]ou just go ahead, oh, absolutely go ahead and green light. . . . I need the stuff done." At this time they also coordinated the delivery of the money collection.

Vasco and Croke spoke the next day, April 29, and Croke expressed disappointment that the money collection had been "a little light." Croke told Vasco that Vasco would need to come up with some up-front money to help defray the initial costs of the murder. Vasco assured Croke that he would immediately arrange for a payment of $400, although Croke received only $200. On May 16, Croke told Vasco that "the project" was in its very final stages, to be "completed very soon."

During this time, Tricia was contacted by the ATF and agreed to help with the investigation by posing for photographs that could be offered to Vasco to indicate that she was dead.

On May 17, 2005, Croke, again posing as Mike, went to the ECCF to meet with Vasco in person. In this meeting, Croke announced that Tricia was dead, and showed Vasco photos of her staged death. Vasco's response was to smile. Two weeks later, after being interviewed by ATF agents about whether he knew anything about the disappearance of his wife and daughter, Vasco was confronted by Croke, informed that the operation had been a sting, and arrested. Among Vasco's belongings recovered from his

cell were a slip of paper containing Mike's name and the Portland, Maine address, and an envelope of newspaper clippings about Scott Peterson's trial for the murder of his wife, dating as far back as October 2004.  On the envelope was written "I Don't Want This That happen To me."

Vasco was charged with five counts of use of interstate commerce facilities in the commission of murder-for-hire, in violation of 18 U.S.C. § 1958.  Four counts related to the plot against Tricia, based on the different occasions that Vasco had used either the mail or the telephone to contact Croke.  The fifth count related to Claudia, based on the use of the mail, specifically the "Nickie" letter.

## B.  Procedural History

Vasco did not testify at his trial.  He moved for a judgment of acquittal at the close of the government's evidence, and again at the close of all of the evidence.  At the charge conference, Vasco requested an instruction on entrapment.  The government objected to that request, and the court elected not to deliver the instruction.  Vasco renewed his objection to the court's failure to deliver an entrapment instruction at the close of the jury instructions.

During deliberations, the jury sent the following note to the court:  "Should we be considering outside human influences such as Kevin Perry when trying to determine whether or not it was

the defendant's intents [sic] on the murder of his wife." The district court's proposed response -- to state that the government must prove beyond a reasonable doubt all the elements of the offenses charged in the indictment, and that the jury could consider all the evidence in determining whether the government had met its burden -- was accepted by both the government and Vasco, and issued to the jury. Approximately one hour later, the jury returned a verdict. Vasco was convicted on all five counts, and the court later sentenced him to 240 months imprisonment.

We will address first Vasco's contention on appeal that the district court erred in not giving an entrapment instruction.

## II.

### A.   Entrapment Instruction

Vasco's entrapment instruction request was based on his claim that he was "induced or persuaded by law enforcement officers or their agents[1] to commit a crime that he was not otherwise ready and willing to commit." Because Vasco preserved his objection below, we review the district court's refusal to instruct the jury on entrapment de novo. United States v. Teleguz, 492 F.3d 80, 83

---

[1]   We have not previously determined whether there may be situations in which the actions of an individual who intends to become (and eventually becomes) a formal informant, undertaken before actually formalizing cooperation arrangements, are attributable to the government. United States v. Young, 78 F.3d 758, 760 (1st Cir. 1996). As the resolution of this question has no bearing on the outcome here, we proceed -- solely arguendo -- as though Perry was a government actor.

(1st Cir. 2007).  In doing so, we "examine the evidence in the light most favorable to the accused so as to determine whether the record supports an entrapment theory."  United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008).

Entrapment is an affirmative defense.  Id. at 14.  To be entitled to an entrapment instruction, a defendant must adduce "some hard evidence" that (i) government actors induced him to commit the charged crime and (ii) he was not predisposed to commit that crime.  Id.;  Young, 78 F.3d at 760 (citing United States v. Rodríguez, 858 F.2d 809, 814 (1st Cir. 1988)).  While this burden is "modest," it "requires more than self-serving assertions." Shinderman, 515 F.3d at 14; see also Young, 78 F.3d at 760 ("[A] defendant must show hard evidence that, if believed, would lead a reasonable person to the requisite conclusion; it is not enough that there be doubt in the absence of evidence on a given point.") (citations omitted).

We start with the question of whether Vasco produced the requisite evidence of improper government inducement.  To demonstrate inducement, a defendant must show not only that the government provided the defendant with the opportunity to commit the crime, but also the existence of a "plus" factor that raises concerns of "government overreaching."  United States v. Gendron, 18 F.3d 955, 961-62 (1st Cir. 1994).  Examples of overreaching include "intimidation, threats, dogged insistence," Young, 78 F.3d

at 761 (internal quotation marks and citation omitted), and "excessive pressure," United States v. Turner, 501 F.3d 59, 70 (1st Cir. 2007).

The government concedes, for purposes of this appeal (at oral argument, if not in its brief) that its actions provided Vasco with the opportunity to commit the crime. The dispute thus hinges on whether the record reveals overreaching by the government, through such conduct as intimidation, threats, dogged insistence, excessive pressure or exploitation of a noncriminal motive. Such governmental overreaching is not present in this case.

In Rodríguez, 858 F.2d at 811, we held that the defendant had successfully demonstrated the existence of a plus factor sufficient to show inducement. In that case, Rodríguez testified that he was repeatedly pressured to sell drugs by a government informant. The government agent "designed the plan, created the opportunity for defendant's participation, made the initial approach, solicited defendant forcefully, and displayed dogged insistence until Rodríguez capitulated." Id. at 815.

Vasco argues that the government's conduct here also constitutes overreaching. We first consider Croke's conduct in the meetings and phone calls. Contrary to Vasco's contention, Croke displayed the opposite of "dogged insistence." Instead, Croke gave Vasco the opportunity to back away from the crime when Perry indicated that Vasco might be developing cold feet. Croke told

-10-

Vasco that if he did not want to go forward with the plan that it was "fine by me . . . I haven't put any time or money into it . . . . [I]f, you know, you don't want to do it, it's, it's fine . . . ." Vasco countered that he did indeed wish to go through with the murder and the kidnaping. Moreover, not only did Croke give Vasco an opportunity to avoid committing the crime, the record establishes that he did not threaten, intimidate, forcefully solicit, or otherwise play upon Vasco's non-criminal motives to get him to commit the crime. See Gendron, 18 F.3d at 961-62 (listing these examples of inducement).

Neither did Perry's conduct rise to the level of intimidation, threats, dogged insistence, or excessive pressure. Perry was certainly helpful in pulling together the plan: he arranged the introduction to Croke, placed the phone calls using his own PIN, and made suggestions for how to dispose of Tricia's body. At Croke and Vasco's first meeting, in discussing how to bury the body, Vasco referred to Perry and said, "it's pretty much his idea," "it's his way to do this," and, "so he pretty much helped me out with this." Taking these statements in the light most favorable to Vasco, but also in the context of the entire conversation, Vasco meant that burying Tricia's body in cement was Perry's idea -- not the plan to murder her in the first place. Perry's act of befriending Vasco was also not overreaching, because Perry did not take advantage of the friendship by exploiting

-11-

Vasco's sympathy, or a similar motive, to entice him into the scheme. See Turner, 501 F.3d at 70; see also Young, 78 F.3d at 761-62 ("[F]riendship, without a plea predicated upon friendship . . . does not constitute sufficient inducement.").[2]

And, importantly, the record evidence strongly suggests that Vasco committed the charged crimes free from government coercion, intimidation, excessive pressure or dogged insistence. For example, the record indicates that Vasco was the one who broached the subject of killing his wife with Perry and that he asked Perry for assistance in finding someone to commit the murder. Vasco also wrote the letter containing a coded request to murder his wife and daughter without assistance from Perry, adding Perry's name and inmate number (without Perry's permission) as a return address. And although Perry and Vasco had discussed the "Nickie"

_____

[2]  In addressing Perry's conduct, Vasco argues that the question asked by the jury in the course of deliberations, whether to consider the influence of Perry in determining whether Vasco had the necessary criminal intent, indicated that the jury believed that Perry was influential in Vasco's decision-making. But our inquiry is focused on what the record evidence shows with respect to inducement.

Vasco's citation to United States v. Luisi, 482 F.3d 43, 49 (1st Cir. 2007), is inapposite. In Luisi, the district court determined that the record facts merited an entrapment instruction. The instruction, however, failed to make clear whether the allegedly inducing statement (pressuring the defendant to commit drug crimes) was attributable to the government agent, because the agent did not make the statement directly to the defendant but rather communicated it through a middleman. In concluding that the entrapment instruction was erroneous, we pointed to a question from the jury demonstrating confusion as to whether the statement was attributable to the government. The facts of Luisi are not remotely similar to those in this case.

-12-

code that went into the letter (and Perry may have suggested using a code in the first place) -- Perry testified that the use of codes was the "usual thing[] that you do in prison when you want to do things on the outside" -- Perry also testified that this code, involving a dog and a puppy, was Vasco's idea.

In sum, because Vasco failed to produce the requisite evidence of government inducement, the district court was justified in declining to issue an entrapment instruction. Accordingly, we need not consider the question of Vasco's predisposition, beyond what we have already discussed in assessing the evidence of inducement. See United States v. Sánchez-Berríos, 424 F.3d 65, 76 n.4 (1st Cir. 2005).

For purposes of completeness, we note that Vasco also argues, albeit in a fairly perfunctory manner, that the district court should have given another, slightly different entrapment instruction. Specifically, Vasco argues that even if the government did not entrap him in the classic sense, it did lure him into committing a federal crime by telling him to write and mail a letter. Vasco failed to request an instruction on this theory of defense which the government pegs as an allegation of "manufacture[d] jurisdiction."[3]

There is no need here to discuss the contours of manufactured jurisdiction, a theory of entrapment that we have yet

---

[3] Vasco first raised this argument in his new trial motion.

to examine in any detail.[4]  As we have said in the past, "[w]here a defendant does not offer a particular instruction, and does not rely on the theory of defense embodied in that instruction at trial, the district court's failure to offer an instruction on that theory sua sponte is not plain error."  See United States v. George, 448 F.3d 96, 100 (1st Cir. 2006). (quoting United States v. Montgomery, 150 F.3d 983, 996 (9th Cir. 1998)).  That rule applies here.  Moreover, because the concept of manufactured jurisdiction is not well-developed in this circuit, and has been questioned in others, the district court's decision to not issue a manufactured jurisdiction instruction sua sponte could not have been plain error.  See United States v. Griffin, 524 F.3d 71, 76 (1st Cir. 2008) (defining a "plain error" as one that is "obvious and clear under current law").

## B.  Sufficiency Challenge

We turn next to Vasco's claim that the evidence was insufficient to convict him on Count Five, use of interstate

---

[4]  The Second Circuit's decision in  United States v. Archer, 486 F.2d 670 (2d Cir. 1973), has been credited by some as the source of the manufactured jurisdiction concept.  See United States v. Wallace, 85 F.3d 1063, 1065 (2d Cir. 1996); United States v. Clark, 62 F.3d 110, 111-12 (5th Cir. 1995); United States v. Podolsky, 798 F.2d 177, 180 (7th Cir. 1986).  The Second Circuit has itself noted that "Courts that have construed Archer have taken pains to limit its applicability, and to explain that 'manufactured jurisdiction' as an independent doctrine is a dubious concept."  Wallace, 85 F.3d at 1065 (citations omitted).

-14-

commerce facilities in the commission of murder-for-hire of Claudia.

Where preserved, we review a challenge to the sufficiency of the evidence de novo, examining the evidence in the light most favorable to the jury's verdict.  See United States v. Cruz-Rodríguez, 541 F.3d 19, 26 (1st Cir. 2008).  We must affirm if "we conclude that a rational factfinder could find that the government proved the essential elements of its case beyond a reasonable doubt."  Marin, 523 F.3d at 27.

It is a crime to use "the mail or any facility of interstate or foreign commerce, with intent that a murder be committed . . . as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value . . . ."  18 U.S.C. § 1958.  Vasco suggests that since the only mention of murdering Claudia is the coded reference in the "Nickie" letter, and the rest of the evidence concerns kidnaping her instead, he cannot be convicted under the statute because his intent was to kidnap Claudia, not to murder her.  The doctrine of conditional intent renders the claim irrelevant.

Intent to commit a wrongful act may be demonstrated through a showing that the intent is conditional.  See Holloway v. United States, 526 U.S. 1, 11 (1999) ("An intent to kill, in the alterative, is nevertheless an intent to kill.") (internal quotation marks and citation omitted).  In the "Nickie" letter,

-15-

after requesting that Nickie be buried "10 feet down and do not forget the cement thing," Vasco wrote, "Also I'd like to know if Candy [code for Claudia] would be able to see the family if not she must stay with Nickie down there." As the earlier communication had established that sending Nickie to the vet was code for murder, a reasonable jury could have found, based on the statement that Candy "must stay with Nickie down there," that Vasco intended to have Claudia killed, if she could not be abducted.

Vasco points out that the reference to Claudia in Perry's handwritten notes sent to the ATF before the "Nickie" letter was received suggests that Vasco desired to arrange Claudia's kidnaping. Additionally, his communications with Croke and his conversations with Perry mentioned Claudia in the context of arranging her kidnaping and securing transportation to Ecuador. Croke even acknowledged in his testimony at trial that at no time, in all of his conversations on the phone or in person with Vasco, did Vasco mention killing his daughter. But it was for the jury to sort out competing evidence, and there was sufficient evidence to support a conviction on Count Five based on Vasco's conditional intent to murder Claudia.[5]

---

[5] In his supplemental brief, Vasco appears to launch an abandonment or renunciation defense, suggesting at various points that he may have "changed [his] mind" about killing his daughter. Even assuming arguendo that such a defense could be advanced, see United States v. Buttrick, 432 F.3d 373, 377 (1st Cir. 2005), it would not be successful here. We have referred to the Model Penal Code when discussing the abandonment defense. Id. at 376-77. The

-16-

## C.  Sentencing

Lastly, we turn to Vasco's claims of sentencing error, specifically (1) the court's use of a cross-reference provision involving "underlying unlawful conduct;" (2) the court's decision to "group" the convictions separately based on the two intended victims; (3) the decision to impose a consecutive, rather than concurrent, sentence on one count, allegedly in excess of the statutory maximum sentence; and (4) that the government committed sentence factor manipulation with respect to the changes involving his daughter.[6]

We review legal challenges to the interpretation or application of the Guidelines de novo. United States v. Rivera, 448 F.3d 82, 84 (1st Cir. 2006). If a defendant did not specifically object at sentencing, however, we review for plain error only. United States v. Brito, 427 F.3d 53, 66 (1st Cir. 2005). We review a district court's decision as to whether to impose consecutive or concurrent terms of imprisonment for an abuse

---

Code provides that where a defendant's "conduct would otherwise constitute an attempt . . . it is an affirmative defense that he abandoned his effort to commit the crime or otherwise prevented its commission, under circumstances manifesting a complete and voluntary renunciation of his criminal purpose." Model Penal Code § 5.01(4). The record makes plain that no such renunciation occurred in this case.

[6] We apply the label "sentence factor manipulation" to the claim Vasco describes as sentencing entrapment. See United States v. Jaca-Nazario, 521 F.3d 50, 57 (1st Cir. 2008); United States v. Montoya, 62 F.3d 1, 3 (1st Cir. 1995).

of discretion.  <u>United States</u> v. <u>Ziskind</u>, 471 F.3d 266, 268-69 (1st Cir. 2007).

Vasco was convicted of five counts of using interstate commerce facilities in the commission of murder-for-hire.  As provided in the Introductory Commentary to section 3D of the Sentencing Guidelines, if a defendant is convicted on multiple counts, a single offense level is calculated, utilizing the Guidelines' rules for grouping offenses together.[7]  The sentencing court counted Vasco's five convictions by grouping into one group those relating to Tricia (Counts One through Four), but leaving apart Count Five, relating to Claudia.

The commentary provides that the most serious offense is then used as a starting point for determining the appropriate base offense level ("BOL").  Here, the offenses are identical and thus the starting point is the BOL for use of interstate commerce facilities in the commission of murder-for-hire:  the greater of thirty-two or "the offense level applicable to the underlying conduct."  U.S.S.G. § 2E1.4.  The application note to § 2E1.4 states, "If the underlying conduct violates state law, the offense level corresponding to the most analogous federal offense is to be used."  Here, the court determined that the "underlying unlawful conduct" was solicitation to commit murder.  The analogous federal offense, solicitation to commit murder, merited a BOL of thirty-

_____

[7]  Vasco was sentenced under the 2006 Guidelines.

three under § 2A1.5. Vasco's BOL was then increased from thirty-three to thirty-seven pursuant to § 2A1.5's provision for a four-level increase if the offense involved the offer of anything of pecuniary value.

As Vasco's convictions were counted in two groups, the court then adjusted Vasco's BOL upward two more levels pursuant to § 3D1.4 to account for the additional offense group reflecting an equally serious conviction. The resulting BOL of thirty-nine produced a Guidelines Sentencing Range ("GSR") of 262 to 327 months. Vasco was sentenced below the GSR to 240 months imprisonment.

The details of Vasco's claims are that: 1) where the offense charged was that in § 2E1.4 (use of interstate commerce facilities in commission of murder-for-hire), there should not have been a cross-reference to § 2A1.5 (solicitation to commit murder); and the cross-reference was impermissible under Apprendi v. New Jersey, 530 U.S. 466 (2000); 2) the separate grouping of Counts One through Four and Count Five, and the corresponding two-level increase under § 3D1.4, was erroneous as all of the charged counts were part of the same course of conduct; 3) his 240-month sentence violated the statutory ten-year maximum term of imprisonment under 18 U.S.C. § 1958; and 4) the government committed sentence factor manipulation. His first two arguments are reviewed de novo, his

third for an abuse of discretion, and his fourth, not raised at sentencing, for plain error.

Vasco's first argument, that the district court erred in cross-referencing § 2A1.5, fails. The reference in § 2E1.4 to a BOL of the greater of thirty-two or "the offense level applicable to the underlying conduct" is curious, as virtually every time a defendant is charged with the use of interstate commerce facilities in the commission of murder-for-hire, the underlying unlawful conduct will be solicitation to commit murder.[8] Thus, the BOL for the use of interstate commerce facilities in the commission of murder-for-hire is thirty-three under the cross-reference to § 2A1.5. We see no impropriety in the district court's having used the cross-reference. Nor did the court commit <u>Apprendi</u> error in enhancing Vasco's sentence based on underlying conduct that differed from the offense of conviction. A sentencing court may make factual findings that result in an increase to a defendant's sentence as long as the sentence imposed is within the default statutory maximum. <u>United States</u> v. <u>Perez-Ruiz</u>, 353 F.3d 1, 15 (1st Cir. 2003). As we note later, the sentence here is within that maximum.

Vasco's next argument amounts to a contention that all five counts of conviction involved "substantially the same harm"

---

[8]  At sentencing, the court made note of this "anomaly" rendering the BOL of thirty-two irrelevant in most, if not all, cases.

and should have been grouped together, such that he should not have been given a two-level increase under § 3D1.4 for the murder-for-hire of Claudia. A sentencing court must group convictions "involving substantially the same harm . . . together into a single Group." U.S.S.G. § 3D1.2(b). "Substantially the same harm" is defined as "counts involv[ing] the same victim and the same act or transaction." U.S.S.G. § 3D1.2(a). Vasco argues that the "Nickie" letter and the telephone calls to Croke were all part of the same act or transaction, and thus all five counts should be grouped as one. He ignores, however, the part of the definition of "same harm" limiting the rule to counts involving the same victim. Crimes involving multiple victims, even if the offenses arose out of a single event, are properly grouped separately. See, e.g., United States v. Hernandez Coplin, 24 F.3d 312, 319 n.7 (1st Cir. 1994); see also United States v. Wolfe, 435 F.3d 1289, 1302 n.9 (10th Cir. 2006); United States v. Torrealba, 339 F.3d 1238, 1243 (11th Cir. 2003). The district court correctly imposed a two-level increase under § 3D1.4 based on the two distinct groups of offenses.

Vasco also makes a related argument concerning the district court's decision to impose the 120-month sentence for Count Five consecutively with the 120-month sentence for Counts One through Four. Vasco contends that his cumulative sentence of 240 months imprisonment, 120 months for Counts One through Four and 120

-21-

months for Count Five, exceeded the ten-year statutory maximum applicable under section 1958.  We review the court's decision for an abuse of discretion.  Ziskind, 471 F.3d at 268-69.

The GSR of 262 to 327 months and the 240-month sentence the district court imposed were both substantially greater than ten years.  The Guidelines, however, provide for such a scenario, in which a defendant is sentenced on multiple counts of conviction, at least one of which has a statutory maximum sentence, to a term of imprisonment greater than the statutory maximum.  See U.S.S.G. § 5G1.2(d) ("If the sentence imposed on the count carrying the highest statutory maximum is less than the total punishment, then the sentence imposed on one or more of the other counts shall run consecutively, but only to the extent necessary to produce a combined sentence equal to the total punishment.")  (emphasis added).  In that event, the sentencing court stacks sentences, imposing consecutive sentences in order to achieve the total contemplated punishment.  See United States v. Garcia-Torres, 341 F.3d 61, 74-76 (1st Cir. 2003).  Thus, the district court's decision to make the sentence for Count Five consecutive to the concurrent sentences for Counts One through Four was not an abuse of discretion and was in fact mandated by § 5G1.2(d).[9]

---

[9] Vasco contends that United States v. Wynn, 987 F.2d 354, 358-59 (6th Cir. 1993) compels a different result.  In Wynn, the Sixth Circuit held only that "separate phone calls which relate to one plan to murder one individual constitute only one violation of 18 U.S.C. § 1958."  Id. at 359.  Vasco was convicted of five counts of

Finally, we address Vasco's sentencing factor manipulation argument. Vasco argues that killing Claudia was included in the "Nickie" letter at the suggestion of the government. Since that reference to killing Claudia was the basis for Count Five and greatly increased the relevant penalties, Vasco argues that the government committed sentence factor manipulation and that the conviction relating to Claudia should not have been considered in calculating his sentence under the Guidelines.

In his effort to show plain error under United States v. Olano, 507 U.S. 725 (1993), Vasco fails out of the gate.[10] Sentence factor manipulation occurs where the government "'improperly enlarge[s] the scope or scale of [a] crime.'" United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005) (quoting Montoya, 62 F.3d at 3). A defendant must establish sentence factor manipulation by a preponderance of the evidence. Id.

Here, there was simply no evidence at trial that the government originated the idea of including a reference to killing Claudia in the letter, or that the government encouraged Vasco to include the reference. See id. Vasco told Perry that he wanted

violating section 1958, related to a plan to murder two individuals.

[10] Under plain error review, Vasco must show: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Duarte, 246 F.3d 56, 60 (1st Cir. 2001).

-23-

his daughter kidnaped and taken to a different country, but if that was impossible, he wanted her killed as well.  And Perry instructed Vasco to put in the letter what Vasco wanted the hit man to do.  As the government neither originated nor encouraged the inclusion of Claudia in the letter, Vasco cannot show by a preponderance of the evidence that the government committed "extraordinary misconduct" in support of this end.  It was not plain error for the district court to decline to find such manipulation.

In conclusion, for the reasons explained above, we **affirm** Vasco's convictions and sentence.[11]

---

[11]  Vasco also argues in his pro se brief that the undercover operation violated his Fifth and Sixth Amendment rights.  We find no merit in his contentions.