# United States Court of Appeals
## For the First Circuit

No. 18-1353

UNITED STATES OF AMERICA,

Appellee,

v.

JON CASCELLA,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. William E. Smith, <u>Chief U.S. District Judge</u>]

Before

Torruella, Lipez, and Kayatta,
<u>Circuit Judges</u>.

Ines de Crombrugghe McGillion, with whom Ines McGillion Law Offices, PLLC was on brief, for appellant.
Donald C. Lockhart, Assistant United States Attorney, with whom Aaron L. Weisman, United States Attorney, was on brief, for appellee.

November 12, 2019

**KAYATTA**, **Circuit Judge**.  Jon Cascella was tried and convicted on seven counts related to possession and distribution of methamphetamine and two counts related to possession of a firearm.  His defense at trial was that he was entrapped by law enforcement officers and a confidential informant acting as their agent.  On appeal, he claims that the following trial errors require reversal:  (1) the court allowed the confidential informant to invoke a blanket Fifth Amendment privilege from testifying; (2) the government did not provide Cascella with certain telephone records showing communications he had with the confidential informant and an undercover officer; and (3) the government's attorney made improper statements during closing arguments.  For the following reasons, we affirm Cascella's conviction.

## I.

Between March and May 2017, Cascella sold methamphetamine on six occasions to undercover police detective Mark Perkins of Warwick, Rhode Island.  Cascella was introduced to Perkins by Bennett, a confidential informant who had recently been released from prison on probation.

The first transaction between Perkins and Cascella occurred on March 29.  On that occasion, Perkins purchased a small quantity of methamphetamine for $100 outside a gas station.  After receiving payment, Cascella told Perkins that he had placed the

- 2 -

methamphetamine in the gas-station bathroom, from which Perkins then retrieved the drugs. Around this time, Bennett informed Perkins that Cascella was also interested in acquiring a firearm.

Perkins again purchased methamphetamine from Cascella on April 4, April 13, April 20, and April 28. The government attempted to record telephone conversations between Perkins and Cascella leading up to each of these purchases, although the equipment failed to record some of these conversations. Some of the drug exchanges were also recorded on video. According to Perkins, the Warwick Police Department does not normally record phone calls. The Department nevertheless began recording the interactions with Cascella on March 30 at the request of the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF) due to the "possible involvement" of a firearm.

The sixth and final transaction between Perkins and Cascella occurred on May 4. Perkins, with the help of undercover ATF agent Wing Chau, had arranged a drugs-for-firearm trade. Cascella gave Chau approximately seven grams of methamphetamine, and Chau gave Cascella a Bryco .380 handgun and $600 cash. Officers arrested Cascella immediately after this transaction. A search of Cascella's home later that day turned up additional methamphetamine and a smoke grenade. Following his arrest, Cascella told the police that he had been selling drugs to four

different customers and that he wanted a gun for protection because he had previously been robbed.

A grand jury indicted Cascella on nine counts: four counts of distribution of methamphetamine to Perkins on March 29, April 4, April 13, and April 20 in violation of 21 U.S.C. § 841(a)(1), (b)(1)(C); two counts of distribution of five grams or more of methamphetamine to Perkins on April 28 and May 4 in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); one count of possession with intent to distribute five grams or more of methamphetamine in violation of 21 U.S.C. § 841(a)(1), (b)(1)(B); one count of possession of a firearm in furtherance of drug trafficking in violation of 18 U.S.C. § 924(c)(1)(A); and one count of being a felon[1] in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2).

The government's evidence that the drug and gun transactions occurred, backed by videos, phone recordings, and the testimony of Perkins and Chau, was overwhelming. Cascella nevertheless pleaded not guilty and went to trial, contending that he was merely a drug user whom Bennett and Perkins entrapped into selling drugs and buying a firearm. Cascella proceeded pro se with standby counsel for part of the trial, then switched to hybrid representation partway through. After closing arguments, the jury

---

[1] Cascella had twice previously been convicted of robbery, serving approximately eight years total.

returned a verdict of guilty on all counts. The court denied Cascella's motions for a new trial and acquittal. Cascella timely appealed.

## II.

### A. Privilege Against Self-Incrimination

Cascella challenges the district court's decision allowing the confidential informant, Bennett, to avoid taking the stand at trial based on a blanket assertion of his Fifth Amendment right not to incriminate himself. Reliance on a blanket assertion of privilege that deprives a defendant of his ability to call a relevant witness to testify is "extremely disfavored." In re Grand Jury Matters, 751 F.2d 13, 17 n.4 (1st Cir. 1984) (quoting In re Grand Jury Witness (Salas), 695 F.2d 359, 362 (9th Cir. 1982)); see United States v. Santiago, 566 F.3d 65, 70 (1st Cir. 2009); United States v. Castro, 129 F.3d 226, 229 (1st Cir. 1997). We have nevertheless at least once allowed such a blanket assertion of privilege when the district court itself confirmed the witness's inability to offer any relevant, non-privileged testimony. See United States v. Acevado-Hernández, 898 F.3d 150, 168–71 (1st Cir. 2018). And we have also on one occasion sustained a similar decision made after the district court interrogated the witness and determined that any non-privileged testimony would be confusingly disjointed and would not substantially advance an entrapment defense. See Santiago, 566 F.3d at 70-71.

Here, the district court neither questioned the witness, nor allowed counsel to question the witness, relying instead on the representations of the witness's appointed counsel, whose understandable aim was to keep his client off the stand. Nevertheless, we need not decide whether the handling of the privilege-pleading witness was error. Rather, we agree with the government that even if there was error, it was harmless. See Delaware v. Van Arsdall, 475 U.S. 673, 681 (1986); see also United States v. Kaplan, 832 F.2d 676, 685 (1st Cir. 1987) (deciding an improper assertion of privilege was harmless error).

Cascella's only proffered reason for calling the witness was to aid his entrapment defense. To Cascella's benefit, the trial judge let the entrapment defense go to the jury. For the following reasons, though, the entrapment defense was so weak that it need not have gone to the jury, even with the evidence that Cascella claims he might have secured from Bennett.

"Entrapment is an affirmative defense." United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009). To present this affirmative defense, a defendant must first carry the burden of production, measured by the sufficiency-of-the-evidence standard. United Sates v. Díaz-Maldonado, 727 F.3d 130, 137 (1st Cir. 2013); United States v. Rodriguez, 858 F.2d 809, 812–14 (1st Cir. 1988). Carrying that burden of production requires proof, first, of "government overreaching," such as "'intimidation, threats, dogged

insistence,' or 'excessive pressure' directed at the target of an investigation by a government agent." Díaz-Maldonado, 727 F.3d at 137 (quoting Vasco, 564 F.3d at 18). The record in this case contains no evidence of any such overreaching. At most, it paints a picture of a government invitation to accept a government-created opportunity to commit a crime. But the law "expect[s] innocent persons to decline such opportunities in the absence of some additional importuning by the government." Id.

So we ask whether the hoped-for, non-privileged testimony from Bennett might have filled in this hole in Cascella's entrapment defense. Cascella tells us that Bennett would have admitted to working with the police, but that is neither contested nor sufficient. Presumably most confidential informants work with and seek to curry favor from the police. Such a relationship may make the informant's conduct attributable to the police, see id. at 138–39, but it says too little about the nature of the informant's contact with the defendant to support an entrapment defense. Cascella claims that Bennett would have also admitted to suggesting that Cascella get a gun, or even encouraging him to do so. But, as we have explained, offering "an 'opportunity' to commit a crime" falls far short of the type of government overreaching that constitutes entrapment. United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994) (quoting Sorrells v. United States, 287 U.S. 435, 441 (1932)).

Nor need we entertain the possibility that Bennett might have said something in his testimony that exceeded the scope of Cascella's proffer. The hypothesis that frames our inquiry posits that Bennett brought undue pressure to bear on Cascella. Were that so, Cascella would obviously be aware of what testimony Bennett might have to help build such a defense; hence, we can expect Cascella's proffer to exhaust the plausible scope of any favorable testimony.

Cascella's contention that testimony from Bennett might have supported a feasible entrapment defense fares even worse when placed in context. The day after the first methamphetamine purchase, Cascella had the following conversation with Perkins, as recorded by the police:

> **PERKINS**: . . . are you with Joe [Bennett] today? He called me.
> **CASCELLA**: Yeah.
> **PERKINS**: Oh, he said you might be interested in trying to get something?
> **CASCELLA**: Ah, no. I just wanted to know what the prices ra-, range.
> **PERKINS**: Yup. Um, I don't - I mean, I know somebody where I can get them.
> **CASCELLA**: Yeah.
> **PERKINS**: Um, do you know what kind you're looking for?
> **CASCELLA**: Ah, just for self-protection.
> **PERKINS**: No, I know. Like ah . . .
> **CASCELLA**: [voice inaudible]
> **PERKINS**: . . . like ah . . .
> **CASCELLA**: [voice inaudible]
> **PERKINS**: . . . a semi-automatic or a revolver?
> **CASCELLA**: Whatever's easiest.
> **PERKINS**: Okay.

**CASCELLA**:  Just not auto.

**PERKINS**:  What's that?  I'm sorry.

**CASCELLA**:  Probably semi-auto, right?

**PERKINS**:  Yeah, yeah.  Yup.  Um, all right. What ah, m-, my boy is totally cool.  Ah, he's always asking me if you ever want, want one. And basically, I, I never got one 'cause I'd probably shoot myself foot, in the foot.  But um . . .

**CASCELLA**:  I just want it for my own personal protection.

**PERKINS**:  Yeah.  No, I hear you.  Um, what - if he's into the shit that I'm into, you know, the, the meth, would you be willing to . . .

**CASCELLA**:  Uh-huh.

**PERKINS**:  . . . trade?  Ah, ah, I haven't talked to him or anything.  I just wanted to talk to you first, you know, ah.

. . .

**PERKINS**:  . . . he, he's the shit.  Um, what was I gonna say?  Yeah, I mean, he, he likes that shit.  So I didn't know if you could - you know, wanted to trade some of that for that or if you . . .

**CASCELLA**:  I ah, you have to give me a number, so I, I get an idea.

**PERKINS**:  Okay.  Yeah, I mean, like I said, I ha-, I haven't even talked to him or anything. Um . . .

**CASCELLA**:  Yeah, just ah, give him a call. Give him a call.

. . .

**PERKINS**:  . . . what are you looking to spend if ah, if it was like money?

**CASCELLA**:  I'm probably looking to spend ah, ah, less than two.

**PERKINS**:  Okay.  All right.  All right.

**CASCELLA**:  I just want it just for myself, even if it's a two shooter, two, two shooter, you know?

**PERKINS**:  Right, okay.  All right.

**CASCELLA**:  Yeah, I want the man know that's the cheapest you can get me, dude.

**PERKINS**:  No, I hear you.  I hear you.  I don't know if - again, I don't - I'm not a gun nut, so I don't know how much they cost.

**CASCELLA**: Me neither. Ah, I ain't, either. That's why I said as long as it - if, if, if it fires, I won't miss.

Nothing in this conversation -- even as supplemented by the hoped-for testimony by Bennett -- suggests that anyone badgered Cascella into acquiring a gun against his own disposition. To the contrary, Perkins offered Cascella reason not to get a gun, explaining why Perkins did not have one. See Vasco, 564 F.3d at 19 (observing that government conduct is not overreaching where an officer gives the defendant an "opportunity to back away from the crime"). In addition to this call, the jury heard Cascella's recorded, post-arrest confession in which he stated that he had been selling drugs to four different customers and that he wanted a gun for protection because he had previously been robbed. And Perkins testified that Cascella had previously said that "normally he charges $450" for an "eight ball"[2] of methamphetamine.

Even viewing Cascella's proposed evidence, as we must, "in the light most favorable to the accused so as to determine whether the record supports an entrapment theory," United States v. Shinderman, 515 F.3d 5, 13 (1st Cir. 2008), we agree that Cascella's defense was -- in the government's words -- "hopeless." On this record, the district court need not have put the entrapment defense to the jury. See Díaz-Maldonado, 727 F.3d at 139. A

---

[2] According to Perkins and Chau, "eight ball" is a slang term meaning one-eighth of an ounce of drugs.

*fortiori*, the failure to allow Cascella a chance to elicit from Bennett the proffered, possibly non-privileged testimony was harmless beyond a reasonable doubt.

Four somewhat related loose ends remain. First, Cascella argues on appeal that the district court's observation that Cascella could testify himself about his conversations with Bennett "unreasonably burden[ed] Cascella's right not to testify." But Cascella had already clearly signaled to the district court that he planned to testify, claiming in his opening statements at trial that he would testify and only deciding not to do so after the court's ruling that Bennett would not take the stand. In any event, any possible error in this regard would suffer from the same harmless-error problem. Second, Cascella argues for the first time in his reply brief that the government could have granted Bennett formal immunity under 18 U.S.C. § 6003. See Note, The Sixth Amendment Right to Have Use Immunity Granted to Defense Witnesses, 91 Harv. L. Rev. 1266 (1978); see also United States v. Quinn, 728 F.3d 243, 251 n.1 (3d Cir. 2013) (en banc); Curtis v. Duval, 124 F.3d 1, 9 (1st Cir. 1997). That issue was not properly preserved, so we do not address it. See United States v. Tosi, 897 F.3d 12, 15 (1st Cir. 2018) ("[A]rguments available at the outset but raised for the first time in a reply brief need not be considered."). Third, for that same reason, we do not address the argument, also raised for the first time in the reply brief, that

- 11 -

Bennett may have waived any claim of privilege by speaking with the government attorney and federal agents the day before appearing at trial. Fourth, we are not deciding whether Cascella could have requested a jury instruction that a confidential informant was unavailable to testify, or had pleaded the Fifth. Cascella never requested a jury instruction about Bennett's refusal to testify, and he does not raise the issue on appeal. So, we need not decide whether such an instruction would be appropriate or the precise contours of such an instruction. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) (requiring an argument on appeal to be sufficiently developed in the appellant's opening brief).

## B. Brady Challenge

Cascella's next argument arises from what at best can be described as the government's sloppy handling of information it obtained prior to trial concerning his phone usage. The government subpoenaed T-Mobile for records of Cascella's cellphone usage between March 8 and May 4, the day of his arrest. Rather than turning over to Cascella the data as received from T-Mobile, the government put it into a spreadsheet, which it then produced to Cascella, describing it as "toll records received pursuant to . . . subpoena listing call times by EST, rather than GMT as originally provided by the carrier." The government also extracted call data from Cascella's phone (including the SIM card). It then

sent a DVD to Cascella, describing it as "a DVD containing the report of data extraction from your cellular telephone."

After trial, Cascella's counsel obtained the actual customer cellphone records (rather than just the data) directly from T-Mobile. Those more extensive T-Mobile records showed eleven additional contacts between 1:45 p.m. and 8:45 p.m. on March 29. Those contacts consist of three texts from Bennett, a 75-second call from Bennett, another text from Bennett, a 50-second call from Perkins, a text from Perkins, a 25-second call from Perkins, a 19-second call from Cascella to Bennett, a 5-second call from Cascella to Bennett, followed by a 71-second call from Bennett to Cascella. None of the records revealed the substance of any communications, other than that the phone calls were extremely brief. With the additional records in hand, Cascella moved for a new trial. He claimed that the government had manipulated the data provided to him to hide those contacts. And he claimed as well that the government had destroyed and not produced additional text data that he says should have been extractable from his cellphone.

The hearing that ensued produced a confusing record concerning what happened. Understandably suspicious given the apparent disparity in the records, Cascella asserted that the government had manipulated and hidden data confirming his additional contacts with Bennett and Perkins prior to March 30.

Government counsel added to the cause for suspicion by telling the court, imprecisely and incorrectly, "[w]hat we got, we turned over." Less imprecisely, the government flatly denied destroying or concealing anything, attributing the difference in the data to differences in what it received from T-Mobile and what T-Mobile provided in a different form to its customer.

The district court resolved all of this by turning to the issue of prejudice. A Brady violation calls for a new trial only if, among other things, "the defendant was prejudiced by the suppression [of evidence] in that there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Del-Valle, 566 F.3d 31, 40 (1st Cir. 2009); see Brady v. Maryland, 373 U.S. 83, 87 (1963). "We review the denial of a new-trial motion on the basis of an alleged Brady violation for manifest abuse of discretion." United States v. Martínez-Mercado, 919 F.3d 91, 104-05 (1st Cir. 2019).

The record in this case includes recordings and videos of Cascella selling drugs to Perkins in a manner that makes clear Cascella had done it before. It also contains the transcript of his conversation with Perkins concerning the gun, which occurred after the missing calls. Nothing that Cascella said during that conversation reads as if he had previously been unduly pressured by anyone to get a gun against his own disposition. Furthermore,

- 14 -

Cascella's contention that the evidence of the additional calls would have helped him reveals only that he misunderstands the burden of generating an entrapment defense. Although a party to all the calls, he makes no proffer that Bennett or Perkins said anything on those calls that would constitute the type of overreaching conduct required to prove entrapment.

Cascella also wished to use the phone records to impeach Perkins's testimony that he had only called Cascella once prior to March 30. The customer records provided directly by the carrier show an additional 25-second call. But there is no claim by Cascella that Perkins said anything in that brief call that would give rise to an entrapment defense. As we have said before, "there is no Brady violation compelling a new trial when the belatedly supplied evidence is merely cumulative or impeaching on a collateral issue." Id. at 105.

## C.  Closing Arguments

Finally, we consider Cascella's challenge to the government's statements in closing arguments. During closing arguments, the government frequently referred to Cascella as a "drug dealer." For example,

> **THE GOVERNMENT**: Look, the Defendant was a drug dealer . . . .
> . . .
> **THE GOVERNMENT**: [T]he Defendant revealed many aspects of his being a drug dealer.
> . . .
> **THE GOVERNMENT**: He's a quality dealer.

. . .

> **THE GOVERNMENT**: The undercover officers in this case presented a drug dealer an opportunity to do what the drug dealer does: Deal drugs. And he dealt drugs. . . . [H]e's a drug dealer. He dealt drugs because he's a drug dealer and he wanted to deal drugs.

The government also said, in reference to a video played for the jury of Cascella slipping methamphetamine into the center console of a car rather than handing it directly to Perkins, that "[t]his is not something a novice does. This is learned behavior, concealment of what you're doing. This is not his first rodeo. He's been doing this a while."

The government also made the following comment in reference to a recorded phone call played for the jury between Perkins and Cascella in which Perkins had referred to the March 29 bathroom exchange:

> **THE GOVERNMENT**: This transaction at the Speedway [gas station] on April [sic] 29th involved Perkins having to go into a bathroom, collect the drugs from on top of a fire alarm or a fire box. Detective Perkins repeatedly referenced that. As you might understand, he was interested in obtaining the drugs and moving on. He didn't want to be out of his car. He didn't want to go into bathrooms. He didn't want to get into that, so he kept referencing that in subsequent calls and in subsequent meetings. Not once do you hear the Defendant, What are you talking about, what bathroom?
>
> Defendant is telling you that the March 29th transaction occurred. Defendant is telling you that that phone call occurred.

- 16 -

Cascella failed to make contemporaneous objections to these statements, so our review is for plain error. See United States v. Salley, 651 F.3d 159, 164 (1st Cir. 2011). "Plain error requires a showing (1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." Id. (quoting United States v. Landry, 631 F.3d 597, 606 (1st Cir. 2011)).

Cascella first challenges the government's repeated reference to him as a "drug dealer," claiming that such statements were "extremely prejudicial." It is elementary that prosecutors may not present their own personal opinions to the jury. See Greenberg v. United States, 280 F.2d 472, 474–75 (1st Cir. 1960); Restatement (Third) of the Law Governing Lawyers § 107 (Am. Law Inst. 2000). Calling Cascella a "drug dealer" could arguably be viewed by some people as a form of vouching; i.e., offering the prosecutor's own opinion of the defendant's guilt. Cautious government attorneys might avoid this potential problem by saying instead, "the evidence shows that the defendant is a drug dealer." But that could become quite repetitious, and trial courts, as here, generally remind jurors that comments and statements made by the government's attorneys are not evidence. In any event, we have not found a failure to employ such a finely parsed phrasing

prejudicial, even in opening statements, at least where the record contained ample evidence to support the contention that the defendant was a drug dealer.  See United States v. Capelton, 350 F.3d 231, 237-38 (1st Cir. 2003) (finding no prejudice from the government's reference to defendants as "drug dealers" in opening statements).

In this case, the government directly supported its assertion by pointing to the record evidence and did not claim any knowledge based on evidence outside the record.  In context, the belatedly challenged statements plainly read more like "the evidence shows he is a drug dealer" than "I think he is a drug dealer."  We see no plain error here.

Cascella makes a slightly different argument concerning the statement that "[t]his is not his first rodeo."  According to Cascella, this statement "impermissibly raises facts not in evidence and suggests the government has special access to unadmitted evidence of prior misconduct of unspecified duration and frequency."  We are not persuaded.  It is true that government attorneys may not "impl[y] that [a] witness's testimony is corroborated by evidence known to the government but not known to the jury."  United States v. Valdivia, 680 F.3d 33, 48 (1st Cir. 2012) (second alteration in original) (quoting United States v. Francis, 170 F.3d 546, 551 (6th Cir. 1999)).  But here the comment was made in reference to a video of Cascella performing an evasive

maneuver that a juror could assume was a behavior learned from drug dealing. We see no reason why the government could not point this out, nor was there anything unfair about the colloquial language used to make the point.

Lastly, Cascella argues that one of the government's statements impermissibly brought to the jury's attention Cascella's refusal to testify on his own behalf. Government attorneys may not comment to the jury on a defendant's decision not to testify. See Griffin v. California, 380 U.S. 609, 613 (1965); United States v. Wihbey, 75 F.3d 761, 769 (1st Cir. 1996). In support of his argument, Cascella points to the prosecutor's statement that "[n]ot once do you hear the Defendant, What are you talking about, what bathroom?" Again, context matters. This comment was part of a description of a phone call between Perkins and Cascella about the March 29 gas-station-bathroom transaction. The prosecutor was not saying "[n]ot once d[id] you hear the Defendant" testify that he did not put drugs in the bathroom. He was clearly saying "[n]ot once do you hear the Defendant" in this phone call deny knowledge of the previous transaction. The former would be improper in a case where the defendant did not take the stand, but the latter is permissible.

Finding no error as to any of Cascella's challenges to the closing arguments, we need not consider the remaining elements of plain-error review.

## III.

For the foregoing reasons, we <u>affirm</u> Cascella's conviction.