# United States Court of Appeals
## For the First Circuit

No. 12-1513

UNITED STATES,

Appellee,

v.

CHRISTIAN DÍAZ-MALDONADO,

Defendant, Appellant.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF PUERTO RICO

[Hon. Aida M. Delgado-Colon, U.S. District Judge]

---

Before

Howard, Lipez, and Kayatta,

Circuit Judges.

---

Raymond J. Rigat for appellant.
Jacqueline D. Novas-Debien, Assistant United States Attorney, with whom Juan Carlos Reyes-Ramos, Assistant United States Attorney, Nelson Pérez-Sosa, Assistant United States Attorney, Chief, Appellate Division, and Rosa Emilia Rodríguez-Vélez, United States Attorney, were on brief, for appellee.

---

August 19, 2013

---

**KAYATTA, <u>Circuit Judge</u>.** A jury convicted Christian Díaz-Maldonado ("Díaz"), a Commonwealth corrections officer, on drug and weapons charges after he provided security for a 2009 drug transaction staged by the Federal Bureau of Investigation as part of a sting operation. Díaz now appeals, primarily arguing that the district court improperly prevented him from presenting an entrapment defense, but also challenging the sentence imposed. Finding no errors, we affirm, subject to a limited remand so that the district court may correct a reference in the written judgment that is in error, albeit without causing any prejudice to Díaz.

## I. Background

The operation that ultimately ensnared Díaz began in 2008. Organized by the FBI and code named "Guard Shack," it sought to capture corrupt law enforcement officers as they engaged in illegal activity. Confidential informants ("CIs") working for the FBI offered targeted officers money to participate in drug transactions staged and secretly recorded by the FBI.

Díaz became a target of Guard Shack following an encounter with Héctor Cotto Rivera ("Cotto"), a former police officer who had become a paid CI when the FBI arrested him on bribery charges. The two met in 2009 while Díaz was recreating on Culebra, a small island off the east coast of Puerto Rico. Cotto witnessed Díaz using drugs and apparently determined that Díaz would be worth pursuing. Cotto "revealed" to Díaz that he was

involved in drug transactions and exchanged telephone numbers with him.

Following this first meeting, Cotto and Díaz spoke several times, both in person and on the telephone. According to Cotto, the two discussed on multiple occasions the possibility of Díaz providing security for a drug transaction. Whether Cotto undertook this recruitment at the FBI's explicit request or as part of his general efforts to identify targets for Guard Shack is unclear, but by early September 2009, agents had decided to pursue Díaz.

On September 9, 2009, Cotto telephoned Díaz and offered him $2,000 for "an hour or two hours" of work "provid[ing] security" for "a street deal." Díaz said that he would not be able to attend due to a conflict with his regular work schedule, but when Cotto conveyed that he had some flexibility on the timing, Díaz agreed to call back the next day to confirm his availability. Unbeknownst to Díaz, Cotto recorded the entire conversation, using equipment provided by the FBI.

The following day, September 10, Díaz called Cotto and said that he would be leaving work early and was able to participate. He agreed to meet Cotto at 6 p.m. in a garage at the Plaza Las Américas. Cotto was unable to record the conversation because he was with others when Díaz called.

At the agreed-upon time, Díaz and another man targeted in the investigation, David González Pérez ("González"), met Cotto at the garage. González -- a former police colleague of Cotto's ultimately sentenced to 292 months' imprisonment on charges stemming from Guard Shack -- arrived first, followed soon after by Díaz. As Cotto later testified, "once [they] were in my car I introduced them to each other . . . . I explained to them in more detail that this was a drug transaction, that there was going to be some kilograms of cocaine, I gave them details that the owner of the drugs was going to be in the apartment and that they had to take care . . . of the security, the safety of the owner and of [me]. Both were armed and they also [each had] a bullet proof vest."[1] Although the FBI had equipped Cotto's cigarette lighter with a disguised audio-video recorder to capture this conversation, González apparently was suspicious of the device and disabled it when he got in the car.

While outlining Díaz and González's duties, Cotto made the fifteen- to twenty-minute drive to the FBI-controlled apartment in Isla Verde where the staged transaction was to occur. Upon arrival, Cotto took Díaz and González up to the apartment, which the FBI was surveilling from an adjacent unit, and introduced them to his purported boss, "Eddie." Although he claimed to be a New

---

[1]Díaz apparently brought a vest emblazoned with "Department of Corrections," and Cotto lent him another. Díaz evidently did not wear his vest.

York-based drug trafficker, "Eddie" was in fact Elvin Quinones, an undercover special agent from the FBI's New York office.

When the supposed buyer arrived, Díaz and González searched him. Díaz took the buyer's cellphone so that the buyer could not use it to record the transaction. Díaz gestured to González that he should lift the buyer's shirt to confirm that the buyer did not have a concealed weapon or recording device. Once satisfied that the buyer was unarmed and unwired, Díaz and González allowed him to enter the living room where the transaction was to occur.

Quinones then retrieved a suitcase from another room and placed it in front of the buyer, who opened it and removed two one-kilogram "bricks" of cocaine. (The bricks were actually high-quality fakes.) The supposed buyer took the fake cocaine and left the apartment, escorted to the door by Díaz and González. After waiting ten minutes for the buyer to leave the area, Quinones removed from a tissue box $6,000, $2,000 each for Cotto, Díaz, and González.

After the transaction, Díaz called Cotto and they had conversations that left Cotto with "no doubt whatsoever that [Díaz] wanted to return to the apartment." The FBI was only interested in involving Díaz with another transaction, however, if he could bring additional corrupt law enforcement officers with him. Díaz

provided the names of two or three persons, but the FBI did not invite him to return.

Just over a year after the staged drug transaction, a grand jury indicted Díaz, González, and fifteen other defendants on drug and weapons charges. Díaz faced three charges: (i) conspiracy to possess with intent to distribute cocaine, 21 U.S.C. §§ 841(a)(1), 846; (ii) aiding and abetting an attempt to possess with intent to distribute cocaine, id. § 841(a)(1), 18 U.S.C. § 2; and (iii) possession of a firearm in relation to a drug trafficking crime, id. § 924(c)(1)(A). Following a five-day trial, a jury found Díaz guilty on the aiding-and-abetting and firearm-possession counts, but acquitted him on the conspiracy count. On March 30, 2012, the district court sentenced Díaz to 123 months' imprisonment -- three months above the 120-month statutory mandatory minimum, but at the bottom of his guidelines range of 123-138 months. Díaz then filed a timely notice of appeal.

## II.  Analysis

**A.   The entrapment defense**

At the beginning of the trial, the government moved in limine to preclude Díaz from raising an entrapment defense in his opening statement. The government argued that Díaz lacked sufficient evidence to raise such a defense. After briefing and examination of an evidentiary proffer from Díaz's trial counsel,

the district court granted the government's motion, explaining as follows:

> I don't find that the defense met the burden of establishing that there is hard evidence to rely on for the defense of entrapment. . . . Of course if something develop[s] during trial from which you can later on present such a request for a jury instruction, that is a totally separate issue.

In the trial that followed, the only evidence proffered relevant to the potential defense was the testimony of Cotto, described both above and in further detail below. At the conclusion of the trial, the district court adhered to its initial determination that there was insufficient evidence to support a finding of entrapment by the jury. The district court therefore rejected Díaz's request that it instruct the jury on entrapment.

Díaz preserved his objections to both of these rulings and now presses them on appeal. As a practical matter, the two issues present only a single question: Did Díaz manage to proffer at least enough admissible evidence to allow a reasonable jury to find in his favor? If so, then Díaz was entitled to a jury instruction on the entrapment defense, Matthews v. United States, 485 U.S. 58, 63 (1988), and the failure to give such an instruction would require that we vacate the conviction. United States v. Gamache, 156 F.3d 1, 12 (1st Cir. 1998); United States v. Rodriguez, 858 F.2d 809, 815-16 (1st Cir. 1988).[2] If not, i.e., if

---

[2]Customarily, in deciding whether the failure to give a requested instruction constitutes reversible error we also ask if

Díaz did not manage to present evidence minimally sufficient to support a jury finding in his favor, then it would necessarily follow both that the refusal to give the requested instruction was correct, and that the order precluding Díaz's counsel from mentioning the defense in his opening statement was harmless error at worst.  Cf. United States v. Hershenow, 680 F.2d 847, 857-59 (1st Cir. 1982)(refusal to allow a defendant to make an opening statement was error, but did not prejudice defendant or warrant reversal); United States v. Teleguz, 492 F.3d 80, 86 (1st Cir. 2007)(no abuse of discretion in barring defendant's closing argument on entrapment where court correctly ruled that an entrapment instruction was not warranted).

We therefore turn our attention to this single controlling question:  Was the proffered, admissible evidence sufficient to raise a jury issue of entrapment?  In answering this question, we review the district court's decision de novo.  See Rodriguez, 858 F.2d at 812; see also United States v.

___

the instruction "(1) was substantively correct; (2) was not substantially covered elsewhere in the charge; and (3) concerned an important point in the case so that the failure to give the instruction seriously impaired the defendant's ability to present his defense." United States v. Rose, 104 F.3d 1408, 1416 (1st Cir. 1997).  However, in cases involving a standard entrapment instruction, when an appellant demonstrates that he met his evidentiary burden and the trial court nonetheless denied him the requested instruction, we typically assume serious impairment and require reversal of the conviction.  See, e.g., Gamache, 156 F.3d at 12 (reversing without a Rose analysis); Rodriquez, 858 F.2d at 815-16 (same).

Dávila-Nieves, 670 F.3d 1, 9 (1st Cir. 2012).  Our function, like that of the district court, "is to examine the evidence on the record and to draw those inferences as can reasonably be drawn therefrom, determining whether the proof, taken in the light most favorable to the defense can plausibly support the theory of the defense."  Gamache, 156 F.3d at 9 (emphasis omitted).  We reverse if there is "some hard evidence" satisfying the defendant's burden.  Dávila-Nieves, 670 F.3d at 9 (citation omitted) (internal quotation marks omitted).

The entrapment defense arose as a creature of judicial "inference about congressional intent," rather than as a command in the express language of the Constitution or of most criminal statutes.  United States v. Luisi, 482 F.3d 44, 52 (1st Cir. 2007).  The defense exists to prevent "abuse[]" of the "processes of detection and enforcement . . . by government officials" who might instigate an illegal "act on the part of persons otherwise innocent in order to lure them to its commission and to punish them."  Sorrells v. United States, 287 U.S. 435, 448 (1932).  Government "officials go too far when they 'implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.'"  Jacobson v. United States, 503 U.S. 540, 553 (1992) (emphasis in Jacobson) (quoting Sorrells, 287 U.S. at 442).

To further this purpose of preventing government abuse, the courts have adopted a two-part test.  First, we look at the government's conduct to see if it is of the type that would cause a person not otherwise predisposed to commit a crime to do so.  See Gamache, 156 F.3d at 9.  Examples of such "government overreaching" include "intimidation, threats, dogged insistence," or "excessive pressure" directed at the target of an investigation by a government agent.  United States v. Vasco, 564 F.3d 12, 18 (1st Cir. 2009) (citations omitted) (internal quotation marks omitted).  If the government's actions do not rise to this level of wrongful pressure, the inquiry ends.  Id. at 20; see also Rodriguez, 858 F.2d at 814.  If the government does overreach, however, we proceed to a second step and look at the particular person to see if that person was in any event predisposed to commit the crime.  Vasco, 564 F.3d at 18, 20.  In other words, Willie Sutton likely could not have beaten a bank robbery charge with an entrapment defense, even if the conduct of the government were such as to cause a person not otherwise predisposed to commit the crime to do so.  See United States v. Acosta, 67 F.3d 334, 337-38 (1st Cir. 1995).  The defendant has the initial burden of production as to both elements of our two-part test, "measured by the time-honored sufficiency-of-the-evidence yardstick . . . ."  Rodriguez, 858 F.2d at 813-14.  Then, if "the defense is properly in the case, the government is

obligated to prove beyond a reasonable doubt that no entrapment occurred." Id. at 815.

To carry his initial burden of production, Díaz points first to the government's creation and presentation of the opportunity to commit the crime of conviction. But that is not enough. United States v. Gendron, 18 F.3d 955, 961 (1st Cir. 1994). Generally, we accept sting operations as an important tool of law enforcement. See Gamache, 156 F.3d at 9; see also Telequz, 492 F.3d at 84-85. We expect innocent persons to decline such opportunities in the absence of some additional importuning by the government. See Gendron, 18 F.3d at 962.

Díaz also points to repetition in the presentation of the opportunity. He argues that Cotto "actively solicited" him on at least five occasions to participate in a drug transaction in exchange for money. This is not a case, however, in which a government agent refused to take "no" for an answer and persisted in recruiting a target on five separate occasions. The record shows that, over the course of several months, Cotto and Díaz spoke by phone several times and happened to run into each other on perhaps as many as several occasions. Cotto first revealed to Díaz his involvement in drug transactions, and then on several occasions discussed the possibility of Díaz participating. There is no evidence that Cotto presented any opportunities during these occasions, or otherwise expressly sought any commitment from Díaz.

-11-

More importantly, there is no evidence that Cotto in any of these casual social contacts sought to overbear any resistance to the idea of a crime. To the contrary, the record paints a picture of Cotto going forward incrementally, first disclosing his own criminality, and then raising the possibility of Díaz's participation in the abstract, encountering no apparent resistance from Díaz at any point. To rule that such communications could give rise to an entrapment defense would force government sting operations to adopt artificially short time schedules, popping the ultimate question before finding out whether the target is actually interested in the crime. Such an outcome would work at cross purposes with the aim of the defense.

Díaz also argues that Cotto improperly played off what Díaz calls their friendship. Although Díaz's counsel elicited testimony from Cotto that he and Díaz first met "in a recreational manner," there was little evidence that the two were friends. Indeed, virtually the only relevant testimony was Cotto's description of their relationship as that of "[a]cquaintances." More to the point, however, Díaz cites no evidence indicating that Cotto solicited his participation by appealing directly to their purported friendship. We thus have both a weak tool for improper importuning and no evidence that that weak tool was even employed. See United States v. Young, 78 F.3d 758, 761-62 (1st Cir. 1996).

Díaz, finally and with greatest emphasis, returns to his repetition argument, this time contending that, in the course of his September 9, 2009, phone call with Cotto, Cotto repeated his entreaties sixteen times in order to overcome Díaz's objections. While our reading of the transcript of the recorded conversation reveals only four entreaties, the key point is that Díaz's reluctance as expressed to Cotto related solely to his work schedule. Indeed, he repeatedly expressed frustration about not being able to participate: "Damn, . . . tomorrow is Thursday." "Damn. The thing is that . . . I can't accept it . . . . I can't assure you, because I don't know at what time I will be out [of work]." A review of the transcript as a whole makes plain that the nature of the objection Cotto sought to overcome was not the type of which the entrapment defense is solicitous.

In reaching this conclusion, we do not entirely disregard the possibility that a target who does not want to commit a crime might raise a scheduling objection as a "polite way" of declining to get involved. Cf. United States v. Joost, 92 F.3d 7, 13 (1st Cir. 1996) (finding reversible error in the denial of an entrapment instruction when the defendant claimed a strategy, "corroborated by the evidence," of "inventing excuses" to avoid participating in criminal activity). Here though, Cotto secured no commitment to participate in the crime during the call. Instead, the prospect of a scheduling conflict remained extant, which left Díaz the out of

-13-

simply telling Cotto the following day that he could not resolve the conflict. The sting went forward only because Díaz, left to his own devices, decided to tell Cotto that he could make it. On such a record, there is simply nothing in the government's actions that one might label the type of overreaching conduct that could be called wrongful inducement within the meaning of the entrapment defense. See Sorrells, 287 U.S. at 442.

To summarize: the government's confidential informant, Cotto, approached a corrections officer, Díaz, whom Cotto observed using drugs. Cotto disclosed to Díaz that Cotto was involved in drug transactions. In response, Díaz agreed to exchange telephone numbers. The two then discussed on several occasions the concept of Díaz providing security for a "street deal," with no evidence that Díaz required much convincing. When Cotto then made a specific proposal, Díaz voiced a scheduling objection, and Cotto changed the details of the proposal to meet those objections, repeating the request and saying he needed the help, which Díaz agreed to supply after determining that he could fit it in his schedule. On these facts, our holding is that Díaz did not produce evidence sufficient to generate a need for the jury to decide if the government overreached.

In focusing at this stage of the analysis on Díaz's apparent disposition as manifest to the government, we are not leaping forward to the second part of the entrapment test, which

examines Díaz's actual predisposition.  Rather, we are evaluating the nature of the government's conduct by considering precisely what hurdles the government's tactics were aimed at overcoming. Five calls to a person who expresses no interest in the crime may raise the types of concerns about improper government inducement that the entrapment defense works to deter.  Comparable persistence in overcoming practical objections by one seemingly comfortable with the idea of committing a crime may, as here, warrant no deterrence.

Our conclusion that Díaz failed to generate enough evidence to raise a jury issue reflects in great part the fact that the entrapment defense is a difficult defense to raise and prevail on.  "Because entrapment is a judicially created doctrine, courts have been careful not to contravene congressional intent to punish those who commit the offense; that, in turn, requires that the doctrine take into account the practical problems faced by federal law enforcement."  Teleguz, 492 F.3d at 84.  Therefore, the defendant must offer evidence not merely of government inducement, but of improper government inducement.  See id.  Similarly, given the need to avoid having criminal trials turn into diversionary examinations of "long-permitted operations of law enforcement," United States v. DePierre, 599 F.3d 25, 27-28 (1st Cir. 2010), aff'd, 131 S. Ct. 2225 (2011), defendants may present the defense only after satisfying their "entry-level burden" of production,

-15-

United States v. Coady, 809 F.2d 119, 122 (1st Cir. 1987); see also

Rodriquez, 858 F.2d at 812.  In twenty-two prior appeals to this

circuit challenging a trial court's refusal to give a jury

instruction on entrapment,[3] we have overruled the refusal only

three times.[4]  The record here does not create the occasion for a

fourth.

---

[3]United States v. Guevara, 706 F.3d 38, 46-47 (1st Cir.
2013)(applying plain error review); United States v. Dávila-Nieves,
670 F.3d 1, 9, 11 (1st Cir. 2012)(applying de novo review); United
States v. Vasco, 564 F.3d 12, 18, 20 (1st Cir. 2009)(de novo);
United States v. Shinderman, 515 F.3d 5, 13, 15 (1st Cir. 2008)(de
novo); United States v. Teleguz, 492 F.3d 80, 83, 85-86 (1st Cir.
2007)(de novo); United States v. Ramos-Paulino, 488 F.3d 459, 461-
62 (1st Cir. 2007)(plenary review); United States v. Sánchez-
Berríos, 424 F.3d 65, 76-77 (1st Cir. 2005)(de novo); United States
v. Diaz-Diaz, 433 F.3d 128, 136 (1st Cir. 2005)(standard of review
unspecified, probably de novo); United States v. Nishnianidze, 342
F.3d 6, 17-18 (1st Cir. 2003)(plenary); United States v. Baltas,
236 F.3d 27, 36-37 (1st Cir. 2001)(plain error); United States v.
Gamache, 156 F.3d 1, 9, 12 (1st Cir. 1998)(plenary); United States
v. Rogers, 102 F.3d 641, 645-46 (1st Cir. 1996)(de novo); United
States v. Vega, 102 F.3d 1301, 1302, 1307 (1st Cir. 1996)(plenary);
United States v. Young, 78 F.3d 758, 760 (1st Cir. 1996)(plenary);
United States v. Joost, 92 F.3d 7, 12, 14 (1st Cir. 1996)(plenary);
United States v. Hernandez, 995 F.2d 307, 313 (1st Cir. 1993)(plain
error); United States v. Tejeda, 974 F.2d 210, 217-19 (1st Cir.
1992)(de novo); United States v. Panet-Collazo, 960 F.2d 256, 259-
60 (1st Cir. 1992)(de novo); United States v. Morales-Diaz, 925
F.2d 535, 539 (1st Cir. 1991)(unspecified, probably de novo);
United States v. Pratt, 913 F.2d 982, 988-89 (1st Cir.
1990)(plenary); United States v. McKenna, 889 F.2d 1168, 1174 (1st
Cir. 1989)(plenary); United States v. Rodriquez, 858 F.2d 809, 812
(1st Cir. 1988)(plenary).

[4]Gamache, 156 F.3d at 12; Joost, 92 F.3d at 14; Rodriquez, 858
F.2d at 815-16.

**B. Consideration of entrapment as a factor at sentencing**

Following his conviction, Díaz faced a statutory mandatory minimum sentence of 120 months. Specifically, each count of conviction carried a 60-month mandatory minimum. See 21 U.S.C. § 841(b)(1)(B); 18 U.S.C. § 924(c)(1)(A)(I). The sentence for the firearm-possession count, however, was subject to a statutory mandate that it be served "in addition to" the drug-related aiding-and-abetting count. See id. § 924(c)(1)(A).[5] The guidelines sentence for Díaz was 123-138 months: 63-78 months on the aiding-and-abetting count, U.S.S.G. §§ 2D1.1(c)(7), 2X2.1., Ch. 5 p. A Sentencing Table, and 60 months on the firearm-possession count, id. § 2K2.4(b).

Díaz, however, sought a downward adjustment for what he claimed was a minimal role in the offense. See U.S.S.G. § 3B1.2.

---

[5]Díaz also appears to argue that the government engaged in unfair sentencing manipulation by asking him to bring a gun to the sting. He has not, however, identified anywhere in the record where he raised this issue below. (The government viewed this as part of his imperfect entrapment claim, and argues that it was not raised below, and so is subject to plain error review.) In this circuit, a judge "can adjust a sentence downward if the judge concludes that the government has improperly enlarged the scope or scale of the crime to secure a higher sentence." United States v. DePierre, 599 F.3d at 29. Here, Díaz only argues that the government could have achieved its goal without having an agent ask him to bring a gun; this hardly suggests the "extreme and unusual case" for which a factor manipulation reduction is appropriate. United States v. Fontes, 415 F.3d 174, 180 (1st Cir. 2005). Sentencing manipulation is a fact-bound, case-by-case inquiry. See id. at 180-82. By not raising the issue clearly below, Díaz deprived the district court of the chance to examine the government's motives in the first instance. On this record, we see nothing approaching an abuse of discretion, let alone plain error.

-17-

Díaz requested the statutory mandatory minimum sentence of 120 months, three months below the guidelines range. The government, in contrast, highlighted Díaz's disregard of his oath as a corrections officer to uphold the law, and sought a sentence at the "higher end" of the guidelines range of 123-138 months. The government did not, however, request a particular sentence. Ultimately the court sentenced Díaz to 123 months.

Díaz now claims that the sentence the district court imposed is "procedurally unreasonable." We review the reasonableness of a sentence for abuse of discretion, following a two-step analysis. United States v. Rivera-Moreno, 613 F.3d 1, 8 (1st Cir. 2010). We first verify that the sentence was procedurally sound, and we then ensure that it was substantively reasonable. Id. Among the examples of procedural infirmity is "failing to consider the § 3553(a) factors," Gall v. United States, 552 U.S. 38, 51 (2007), which guide a sentencing court in reaching a "sufficient, but not greater than necessary" sentence, 18 U.S.C. § 3553(a).

Díaz asserts that by not considering the issue of "imperfect entrapment," the district court did not give proper heed to the section 3553 factors. "Imperfect entrapment" has sometimes been used by other courts as the basis for a downward departure at sentencing when a defendant demonstrated that he was "pressured unduly by the government to go forward with [an] offense . . . ."

United States v. McClelland, 72 F.3d 717, 725 (9th Cir. 1995).
Where, as here, a defendant seeks a downward variance on that
basis, the claim of imperfect entrapment can be thought of as
fairly encompassed in the analysis of the "nature and circumstances
of the offense" under § 3553(a).  United States v. Smith, 358 F.
App'x 634, 638 (6th Cir. 2009) (internal quotation marks omitted);
see also id. at 641-42 (Clay, J., concurring in part and dissenting
in part).

Contrary to Díaz's claim that the judge refused to
consider his imperfect entrapment argument, the sentencing hearing
transcript reveals that the district court in fact did consider the
theory and found it inapplicable.[6]  In making his statement to the
court at his sentencing hearing, Díaz objected that "[a]s far as
why I didn't report [the drug deal to the authorities after it
transpired], it is not fair that the government makes you commit an
offense without a previous investigation, and put[s] you in a very
compromising and difficult situation."  The court asked
specifically what Díaz meant by the government "making [him] commit
an offense."  Rather than arguing that he was manipulated, or that
he was less blameworthy as a result of the government's entreaties,
Díaz objected that Guard Shack was supposed to catch officers

_____

[6] Because we conclude that the district court rejected Díaz's
argument, we need not take up the government's argument on appeal
that he forfeited the issue below.

-19-

already under investigation for corruption, and he had been the subject of no such investigation.

The district judge reviewed Díaz's sentencing memorandum and, after hearing from the defendant and the government, explained the guideline range and then explicitly turned to the section 3553 factors. The court began by considering various factors in Díaz's favor, including his lack of a criminal history and the probability that he would "rehabilitate and turn to the right track and live a law abiding life." As for the alleged entrapment, the court explained:

> In terms of the factors to which [Díaz's] counsel has made reference in the sentencing memorandum and also through [Díaz's] allocution in Court, . . . I must point to the fact that my recollection from the trial in terms of when . . . [Díaz] was alerted that he was to participate in a street deal, was prior to him getting to the apartment in Isla Verde where the drug transaction was to occur. Even though he alludes to the government making an individual commit a crime, to the extent that he clarified and says that based on the fact that he was not a target of a previous police corruption investigation, I can understand that. To the extent that he may equate that to a possible defense of entrapment, I know that that was a factor that was lingering in some of the questions of this defendant, and the Court remained vigilant and based on my evaluation and assessment of the evidence there was no indicia of a possible entrapment defense whatsoever in this case and that is why the instruction was not given.

The judge then proceeded to discuss her view that defendant appeared to be in a "very comfortable position" during the transaction.

In short, the district court concluded that this was not a case in which the defendant had a sympathetic but unsuccessful entrapment defense that might warrant mitigation, though not acquittal. The court's conclusion was supported by the record, and demonstrated consideration of "the nature and circumstances of the offense and the . . . characteristics of the defendant," 18 U.S.C. § 3553(a)(1). In so proceeding, the district court did not abuse its discretion.

## C.  Error related to sentencing

The final error Díaz claims on appeal concerns two mistakes by the district court in referring to the counts of conviction. The court began the sentencing hearing by noting that it had "reviewed once again the verdict form." The court then accurately described the jury's verdict:

> The record should reflect that the defendant went to trial as to Count 1 which is the conspiracy to possess with intent to distribute. The defendant was found not guilty. However, as to the remaining counts he was found guilty in counts 2 and 4. Count 2 . . . [charged] illegal possession with intent to distribute cocaine, and . . . the jury also found him guilty of the possession of a weapon in relation to a drug trafficking crime [Count 4].

The court next asked the parties if they had any clarifications with regard to the presentence report (PSR). The government called attention to the first paragraph of the PSR; as the government explained, it "says count 2 of conviction charges the conspiracy, and that is incorrect." Rather, the government noted, "[c]ount 2

-21-

has to do with the aiding and abetting and attempt to possess with intent to distribute more th[a]n 5 kilograms." The court agreed, acknowledging "[t]hat is correct, and it is to be corrected." (The probation office has since issued an amended report, correcting the error in the first paragraph of Part A, but still incorrectly listing count 2 in the offense summary at the beginning of the report.)

After hearing from the parties, however, the court began its sentencing analysis by repeating the error in the PSR. Specifically, the court said that Díaz "was found guilty by jury trial as to counts 2 and 4 of the indictment in . . . this case, charging," respectively, "conspiracy to possess with intent to distribute . . . cocaine," and "knowing possession of a firearm in furtherance and or in relation to a drug trafficking crime." Díaz did not object, and the court made the same mistake in entering the written judgment.

Díaz now argues that the court's errors prejudiced him, because conspiracy may represent a more serious crime than aiding and abetting, and, he claims, the court may have sentenced him for the wrong crime. He concedes that he failed to raise this issue below, and thus our review is for plain error only. Accordingly, he must demonstrate "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness,

-22-

integrity, or public reputation of judicial proceedings." <u>United States</u> v. <u>Padilla</u>, 415 F.3d 211, 218 (1st Cir. 2005) (en banc) (citation omitted) (internal quotation marks omitted).

While "losing counsel are entitled to troll through transcripts to find alleged glitches," the "plain error rule creates a high threshold where the supposed missteps are ones that no one noticed at the time or, if noticed, thought worthy of a timely objection." <u>United States</u> v. <u>Dehertogh</u>, 696 F.3d 162, 170 (1st Cir. 2012). Here, a review of the sentencing transcript as a whole reveals that the district court was well aware of the counts of conviction for which it was sentencing Díaz, notwithstanding its memorialized misspeaking. Accordingly, we affirm the sentence, but remand the case to the district court to correct its written judgment.

### III. Conclusion

For the reasons stated, we <u>affirm</u> Díaz's conviction and sentence, and <u>remand</u> the case to the district court for correction of the judgment.

<u>So ordered</u>.